IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

WAYNE LEE McCONICO II,

          Petitioner,

   v.

JAMES D. HARTLEY, et al.,

          Respondent.

No. CIV S-07-1342 JCC

ORDER

This matter comes before the Court on Petitioner Wayne Lee McConico II's amended petition for writ of habeas corpus (Dkt. No. 4); Respondent James D. Hartley's answer to the amended petition (Dkt. No. 17);[1] and Petitioner's traverse to the answer (Dkt. No. 19). Having reviewed the relevant documents, the governing law, and the balance of the record, the Court DENIES the amended habeas petition for the reasons explained herein.

**I.    BACKGROUND**

Petitioner is a state prisoner in Avenal, California, serving a six-year sentence pursuant to a 2004 conviction for child molestation. (*See* Clerk's Tr. 371–72 (Dkt. No. 18-13).) In late 2003, the State charged Petitioner with fifteen counts of lewd or lascivious acts with two of his daughter's friends, both children under the age of fourteen. (*Id.* at 257–64.) *See* CAL. PENAL CODE § 288(a).

---

[1] Petitioner named "N. Dawson" as the respondent in his petition. (*See* Am. Pet. 6 (Dkt. No. 4 at 4).) The current warden of Avenal State Prison, however, is James D. Hartley. (*See* Answer 1 n.1 (Dkt. No. 17 at 7).) Accordingly, the Court orders James D. Hartley's name substituted as the respondent in this case. *See* FED. R. CIV. P. 25(d).

ORDER - 1

On September 20, 2004, a jury convicted Petitioner of one of the counts but split on the remaining fourteen counts (Clerk's Tr. 334 (Dkt. No. 18-13)), which the prosecutor's office chose not to retry (*see* Answer 4 (Dkt. No. 17 at 10)). The California Court of Appeal, Third Appellate District, affirmed the conviction, *People v. McConico*, No. C048916, 2005 WL 3497711, at *4 (Cal. Ct. App. Dec. 22, 2005), and both the California Supreme Court and the United States Supreme Court denied review (Cal. Sup. Ct. Order (Dkt. No. 18-2); Sup. Ct. Order (Dkt. No. 18-3)). In 2007, the California Supreme Court also denied Petitioner's two petitions for writ of habeas corpus. (*See* Cal. Sup. Ct. Register (Dkt. No. 18-5) (denying petition on June 27, 2007); Cal. Sup. Ct. Register (Dkt. No. 18-7) (denying petition on procedural grounds on Nov. 14, 2007).)

On July 7, 2007, Petitioner, proceeding *pro se*, filed an application for a writ of habeas corpus with the United States District Court for the Eastern District of California. (Dkt. No. 1.) Petitioner presents four substantive grounds for relief in his amended petition: (1) unlawful state interference with jury selection in violation of Petitioner's right to a fair jury and (2) in violation of his right to due process of law; (3) ineffective assistance of appellate counsel; and (4) miscarriage of justice. (Am. Pet. 9, 18 (Dkt. No. 4 at 7, 16).)

## II. APPLICABLE STANDARD

Federal law requires that a state prisoner provide the state court with the opportunity to rule on federal habeas claims before presenting those claims to the federal court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); 28 U.S.C. § 2254(b)(1). Respondent concedes that Petitioner has exhausted his available state remedies. (Answer 2 (Dkt. No. 17 at 8).)

A federal court will not grant a state prisoner's habeas petition unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or (2) "was based on an unreasonable

ORDER - 2

determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" federal law if the state court applies a rule that contradicts the governing rule from Supreme Court precedent or decides the case differently from a Supreme Court case with materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A decision is an "unreasonable application" of federal law if the state court correctly identifies the governing rule but unreasonably applies the rule to the facts of the petitioner's case. *See id.* at 413. An unreasonable application must be more than incorrect or clearly erroneous; rather, the application must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003) (citations omitted). Similarly, state court factual findings, which are presumed correct, may be rebutted only with a clear and convincing showing that the findings were objectively unreasonable in light of the evidence presented. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*citing* 28 U.S.C. § 2254(d)(2), (e)(1)).

When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court must perform an "independent review of the record" to determine whether the state court clearly erred in its application of Supreme Court precedent. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (*citing Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)). An independent review is not the equivalent of *de novo* review; rather, the Court is required to determine whether a silent state court decision is objectively unreasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Although the federal court independently reviews the record, it still defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167.

The California Supreme Court denied Petitioner's first habeas petition without reasoning or citation. (*See* Cal. Sup. Ct. Register (Dkt. No. 18-5).) This denial constitutes a decision on the

merits of the federal claims. *See Hunter v. Aispuro*, 982 F.2d 344, 347–48 (9th Cir. 1992). The Court, therefore, must perform an "independent review of the record" to determine whether the state court decision was objectively unreasonable. *See Himes*, 336 F.3d at 853.

## III. DISCUSSION

The Court addresses each of Petitioner's grounds for relief in turn below.

### A. Jury Selection

Both of Petitioner's first two grounds for relief are premised on his claim that he was convicted by an unconstitutionally selected jury. (Am. Pet. 9 (Dkt. No. 4 at 7).)

#### 1. Background

On September 10, 2002, Petitioner's defense attorney filed a motion for an evidentiary hearing to investigate the circumstances regarding the running of a warrant check on a prospective African-American juror by the bailiff. (Trial Tr. 7, Sept. 1, 2004 (Dkt. No. 4 at 31).) Upon granting the motion, the trial judge noted that it was not the practice of the court, the sheriff's office, or the individual bailiff to check prospective jurors—minority or otherwise—for warrants. (*Id.* at 8–9.)

During the hearing, the bailiff testified that when the prospective juror in seat 17, Adrian Connor, entered the courtroom during voir dire, the bailiff noticed that the young African-American male was wearing gang-related colors: a red backpack, a red shirt, red shoes, and dark sagging jeans. (*Id.* at 2, 14–15.) Although checks of prospective jurors were not customary, the bailiff, a member of the courthouse's gang intake unit, looked into Mr. Connor as a security measure because gang members often frequented the courthouse. (*Id.* at 21–22, 29–30.)[2] He ran a search of Mr. Connor's name and determined that although Mr. Connor was not a known gang

---

[2] Before the hearing, the judge noted that the bailiff was "new to this department." (*See* Trial Tr. 8, Sept. 1, 2004 (Dkt. No. 4 at 32).) According to the bailiff, he had recently graduated from police academy and had served as a bailiff in only two prior trials. (*See id.* at 20.)

ORDER - 4

member, he did have an outstanding warrant. (*Id.* at 15–19.) None of the other prospective jurors was checked for gang involvement or outstanding warrants. (*Id.* at 24.) When court recessed for the day, the bailiff asked to speak with Mr. Connor, one of the last veniremembers to leave the courtroom, out in the hallway. (*Id.* at 24–26.) According to the bailiff, the two men shared "a very cordial conversation." (*Id.* at 27.) The bailiff asked Mr. Connor whether he was involved in a gang or knew he had an outstanding warrant. (*Id.* at 24, 27, 29.) Mr. Connor replied, no, he was not involved in a gang and, yes, he did know he had an outstanding warrant but did not know how to handle it. (*Id.* at 27, 29.) The bailiff gave Mr. Connor the address of the warrant office and said that, although he would not place Mr. Connor under arrest, Mr. Connor should take care of the warrant in case he later encountered a police officer "having a bad day." (*Id.* at 27–28, 31.)[3] Mr. Connor thanked the bailiff and left (*id.* at 27, 28–29), but did not return for voir dire the following week (*id.* at 36–37).

The bailiff's supervising sergeant testified that, upon hearing that the bailiff had run a check of a prospective juror, he instructed the bailiff to write a report of what happened and not to check prospective jurors again. (*Id.* at 34, 36.) According to the sergeant, in his four to five years at the courthouse, he had never heard of anyone checking prospective jurors for warrants or gang affiliation, and he knew of no sheriff policies requiring checks of prospective jurors for security purposes. (*Id.* at 34–35.)

After listening to the testimonies of the bailiff and his supervisor and oral arguments by counsel, the judge declared that he would be required to take action if the bailiff's investigation was racially motivated. (*Id.* at 41.) The judge found, however, that the bailiff ran the check on Mr. Connor "to seek potential intelligence based on potential gang affiliation rather than [Mr.

---

[3] The warrant was probably for failure to appear stemming from a $189 light rail ticket. (*Id.* at 7.)

ORDER - 5

Connor's] being a member of a particular [race]." (*Id.* at 41–42.) The judge explained:

> The courthouse security is something that everyone is concerned with. If an individual appears to be a member of a particular gang, whether they are or not, it's certainly likely to subject them to greater attention from law enforcement, especially in this building where . . . trials involving gang members . . . and associates are conducted frequently. It might be overstating to say on a daily basis. But it's certainly a very, very common occurrence. . . .
> We've had occasions where metal detectors have been used at the entrance to the particular courtroom rather than the courthouse in general in order to insure the safety of everybody who is involved in the process.
> I think the motivation is what's important here. [And] I think the motivation [in this instance] was more intelligence and security rather than racial bias.

(*Id.* at 42–43.) The judge concluded that these circumstances created insufficient grounds for a *Wheeler-Batson* challenge. (*Id.* at 45.) *See People v. Wheeler*, 583 P.2d 748 (Cal. 1978); *Batson v. Kentucky*, 476 U.S. 79 (1986). Denying the defense's motion to convene a new jury panel, he found that "the effect [of the bailiff's behavior], though unfortunate, is not of such dimension that the panel should be excused and we should start again." (*Id.* at 52.) Later in the day, the defense asked the judge to reconsider his ruling and moved to stay proceedings. (Rep.'s Tr. 145, 148 (Dkt. No. 18-8).) Noting that five of the remaining forty-three jurors were African-American, which constituted 11% of the pool and more than fairly represented the 9% of African-Americans in the county, the judge denied the motion. (*Id.* at 149–50.)

### 2. Analysis

Petitioner makes two related challenges to the jury selection at his trial. (Am. Pet. 9 (Dkt. No. 4 at 7)).) First, he argues that racial discrimination during jury proceedings violated his right to equal protection under the Fifth and Fourteenth Amendments. (*Id.*)[4] Second, he argues that the bailiff's exclusion of qualified jurors on the basis of race violated his right to a fair and impartial

---

[4] Petitioner initially identifies this as a due process violation; however, he analyzes the claim under an equal protection framework. (*See* Am. Pet. 10–13 (Dkt. No. 4 at 8–11) (alleging violation of "petitioners civil, and constitutional rights of due process under the equal protection clause").)

ORDER - 6

jury under the Sixth Amendment. (*Id.*)

### i. Equal Protection

Racial discrimination by the state in jury selection offends the Equal Protection Clause. *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005). A criminal defendant is denied equal protection of the law if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race. *Eubanks v. Louisiana*, 356 U.S. 584, 585 (1958). A defendant, however, has no right to a "petit jury composed in whole or in part of persons of his own race." *Batson v. Kentucky*, 476 U.S. 79, 85 (1986) (*quoting Strauder v. West Virginia*, 100 U.S. 303, 305 (1879). Rather, a defendant has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria. *Id.* at 85–86 (*citing Martin v. Texas*, 200 U.S. 316, 321 (1906); *Ex parte Virginia*, 100 U.S. 339, 345 (1879)).

Petitioner argues that the bailiff's behavior constitutes purposeful discrimination under *Batson*. (Am. Pet. 9, 11–12 (Dkt. No. 4 at 7, 9–10).) In *Batson*, the Supreme Court held that the prosecution's use of peremptory challenges to exclude jurors on the basis of race violates the Equal Protection Clause. 476 U.S. at 89. A *Batson* claim involves a three-step process: (1) the defendant makes a prima facie showing that the prosecution engaged in the discriminatory use of a peremptory challenge; (2) the burden then shifts to the prosecution to provide a race-neutral explanation for the apparent discrimination; (3) the trial court rules whether the defendant has carried the burden of proving the existence of purposeful discrimination. *See id.* at 96–98.

Petitioner has not shown prima facie discrimination under the first step in *Batson*. *See id.* at 96. To demonstrate prima facie discrimination under *Batson*, a defendant must show, *inter alia*, that the prosecution exercised peremptory challenges to remove venire members based on their race. *See id.*; *Powers v. Ohio*, 499 U.S. 400, 411–14 (1991). Petitioner essentially claims that the

prosecutor, limited to making only non-discriminatory peremptory challenges, conspired with the sheriff's department to have the bailiff intimidate prospective minority jurors from serving. (*See* Am. Pet. 12 (Dkt. No. 4 at 10).) Witness testimony, however, refutes that the bailiff was an instrument of the sheriff's department and the prosecution: both the bailiff and his supervisor testified that the bailiff had not been instructed to run background checks of potential jurors and that it was not a practice of the sheriff's department to run these checks. (Trial Tr. 21–24, 34–35, Sept. 1, 2004 (Dkt. No. 4 at 45–48, 58–59).) Furthermore, the prosecutor stated he did not approve of the bailiff's behavior and left it to the Court's discretion to decide whether to start jury selection over. (*See id.* at 40–41.) Given this, Petitioner's argument that the prosecution, sheriff's office, and bailiff colluded to have minority jurors removed from the venire is purely speculative and is not supported by the record.

Even if Petitioner could show that the prosecution used the bailiff to exercise discriminatory peremptory challenges, Petitioner fails to show that the bailiff's conduct raises an inference that Mr. Connor was singled out because of his race. *See Batson*, 476 U.S. at 96. Petitioner claims that, given that his case was not gang-related and that other prospective non-minority jurors wore the same color as Mr. Connor, security was irrelevant to his case and was mere pretext invented to hide the real reason for singling out Mr. Connor—removing an African-American from the jury pool. (*See* Am. Pet. 11–12 (Dkt. No. 4 at 9–10).) Petitioner's claim, however, contradicts the trial court's findings. The judge explained that if the bailiff's investigation had been racially motivated, it would have been improper and required action. (Trial Tr. 41, Sept. 1, 2004 (Dkt. No. 4 at 65).) But given the "very, very common occurrence" of gang-related persons at the courthouse, gang-related security was important "to ensure the safety of everyone involved in the process." (*See id.* at 41–43.) Therefore, although acknowledging that the

ORDER - 8

wisdom of running background checks of prospective jurors was questionable, the trial court found that the bailiff was genuinely motivated by "intelligence and security rather than racial bias." (*Id.* at 43.) This finding is presumptively correct, 28 U.S.C. § 2254(e)(1); *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999), and Petitioner has offered nothing beyond speculation to rebut the presumption, *see Miller-El*, 537 U.S. at 340.[5] Unless motivated by racial bias, running a background check of an African-American venire member is not, in and of itself, sufficient to violate the Equal Protection Clause. *Cf. Batson*, 476 U.S. at 85–86. The Court, therefore, concludes that it was not objectively unreasonable for the California Supreme Court to deny Petitioner's habeas petition for failing to prove purposeful discrimination under *Batson*. *See Pirtle*, 313 F.3d at 1167.

### ii. Right to Fair and Impartial Jury

The selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). The process of selecting jury pools must not systematically exclude distinctive groups in the community. *Id.* at 538. Juries actually chosen, however, need not mirror the community and reflect the various distinctive groups in the population, *id.*, as long as the state has not resorted to discrimination and excluded distinctive groups at other stages in selection process, *Powers*, 499 U.S. at 409.

Petitioner argues that the bailiff's behavior demonstrates a systematic exclusion of African-Americans from serving on jury panels. (Am. Pet. 10 (Dkt. No. 4 at 8).) To establish a prima facie

---

[5] For example, Petitioner points out that even if the bailiff ran the initial background check for security purposes, his continuing to question Mr. Connor about his outstanding warrant implies an improper racial motivation. (*See* Am. Pet. 12–13 (Dkt. No. 4 at 10–11).) The trial judge, however, noted that it was common practice for the bailiff to advise persons in the courthouse to deal with their outstanding warrants rather than to take them into custody. (Trial Tr. 43, Sept. 1, 2004 (Dkt. No. 4 at 67).) Furthermore, the effect that the bailiff's warnings about the warrant had on Mr. Connor "[could] only really be speculated about" because Mr. Connor did not show up for voir dire the following day and could not be questioned further. (*Id.* at 45.)

1  violation of the fair cross-section requirement, Petitioner must establish that (1) the excluded group
2  is a distinctive group in the community; (2) the group's representation in venires from which jurors
3  are selected is not fair and reasonable in relation to the number of such persons in the community;
4  and (3) this underrepresentation is due to systematic exclusion during the jury-selection process.
5  *See Duren v. Missouri,* 439 U.S. 357, 364 (1979).

6  Although the allegedly excluded group—African-Americans—is a distinct group in the
7  community of Sacramento County, Petitioner has not shown that the representation of African-
8  Americans in the jury pool was unfair and unreasonable in relation to the number of African-
9  Americans in the community. *See id.* To prove underrepresentation of a particular group in jury
10 venire, Petitioner must show an absolute disparity using statistical data. *See Thomas v. Borg*, 159
11 F.3d 1147, 1150 (9th Cir. 1998) ("We determine absolute disparity by taking the percentage of the
12 group at issue in the total population and subtracting from it the percentage of that group that is
13 represented on the master jury wheel."). In this case, the trial judge noted that 11% of prospective
14 jurors were African-American, which was "roughly in proportion with their [9%] representation in
15 the county." (Rep.'s Tr. 149–50 (Dkt. No. 18-8).)[6] Petitioner has failed to provide any contrary
16 statistical data showing an absolute disparity of African-Americans represented on jury venires or
17 panels in Sacramento County and, accordingly, fails to meet the second prong of the *Duren* test.
18 *See Thomas*, 159 F.3d at 1150–51.[7] The Court, therefore, concludes that it was not objectively

---

[6] Before Mr. Connor failed to appear, there were at least seven African-American jurors available at voir dire. (Rep.'s Tr. 149–50 (Dkt. No. 18-8).) After Mr. Connor failed to appear and after another African-American juror was excused for hardship, five of the forty-three prospective jurors were African-American. (*Id.*)

[7] In the traverse, Petitioner argues that only 8% of the prospective jurors in his jury pool were African-American, which is "lower than the 9% of African-American population in Sacramento County." (Traverse 7, 9 (Dkt. No. 19 at 15, 17).) Petitioner explains, "On day four, jury voir dire resumed with more than 90 (ninety) prospective jurors in the courtroom. The pool initially began with 8 African-Americans . . . ." (*Id.* at 7 (Dkt. No. 19 at 15); *see also* Answer 8 (Dkt. No. 17 at 14); Rep.'s Tr. 149–50 (Dkt. No. 18-8) (basing figures on the prospective jurors remaining after hardship proceedings).) According to Petitioner's figures, however, eight prospective African-American jurors out of ninety total prospective jurors would mean 8.89% of prospective jurors were African-American. (*See* Traverse 7 (Dkt.

ORDER - 10

1 unreasonable for the California Supreme Court to deny Petitioner's habeas petition for failing to prove a Sixth Amendment fair cross-section claim. *See Pirtle*, 313 F.3d at 1167.

### B.     Assistance of Counsel

Petitioner's third ground for relief is that he was denied effective assistance of counsel on appeal. (Am. Pet. 18–19 (Dkt. No. 4 at 16–17).) To claim ineffective assistance of appellate counsel, Petitioner must show (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "that the deficient performance prejudiced the defense." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986) ("*Strickland*'s two-part test [applies] to determine if appellate counsel's assistance was ineffective."). Judicial scrutiny of counsel's actions is highly deferential. *See Strickland*, 466 U.S. at 689. Courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See id.*

Petitioner asserts, without supporting evidence, case law, or argument, that his appellate counsel was incompetent for failing to raise the following issues on direct appeal: "§ 116.5 Jury Tampering, § 16.5 Obstruction of Justice; § 422.6 interference with exercise of civil rights; § 422.75 protected classes; [and] § 136.1 intimidation of witness and victims." (Am. Pet. 18 (Dkt. No. 4 at 16).) In a letter to Petitioner, his appellate counsel explained why she thought the issues Petitioner urged her to present lacked merit. (May 3, 2005 Letter (Dkt. No. 18-14).) It was not unreasonably deficient performance for counsel to decline to appeal issues that she determined,

---

No. 19 at 15).) Regardless, the Ninth Circuit has repeatedly rejected claims of substantial underrepresentation when the absolute disparity was greater than 1%. *See, e.g.*, *Thomas*, 159 F.3d at 1151 (5% or 1.94%); *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996) (4.9%); *Sanchez-Lopez*, 879 F.2d at 547 (2.05% and 2.8%); *United States v. Suttiswad,* 696 F.2d 645, 649 (9th Cir. 1982) (7.7%); *United States v. Armstrong,* 621 F.2d 951, 955–56 (9th Cir. 1980) (2.83%); *United States v. Kleifgen,* 557 F.2d 1293, 1296–97 (9th Cir. 1977) (2.9%); *United States v. Potter,* 552 F.2d 901, 905–06 (9th Cir. 1977) (2.7%).

ORDER - 11

according to her professional judgment, would not have provided grounds for reversal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (rejecting argument that an "indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points"); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance."). Appellate counsel's letter reveals that she examined the record with a view to selecting the most promising issues for appellate review and briefed the two arguments she determined, according to her professional evaluation, presented arguable issues. (*See* May 3, 2005 Letter (Dkt. No. 18-14).) The Court declines to second-guess appellate counsel's professional evaluation of which issues to raise on appeal. *See Jones*, 463 U.S. at 754 ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy . . . ."). Thus, because Petitioner has not provided the Court with arguments to evaluate each of issues he asserts appellate counsel should have argued (*see* Am. Pet. 18 (Dkt. No. 4 at 16)), he has not overcome the strong presumption that appellate counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.[8] The Court, therefore, concludes that it was not objectively unreasonable for the California Supreme Court to deny Petitioner's habeas petition for failing to prove ineffective assistance of appellate counsel. *See Pirtle*, 313 F.3d at 1167.

---

[8] In the traverse, Petitioner does explain why he believes his appellate counsel should have brought a *Batson* challenge to jury selection. (*See* Traverse 10 (Dkt. No. 19).) The Court has already discussed the merits of this claim in section III.A and defers to appellate counsel's professional judgment in not appealing the issue. *See Strickland*, 466 U.S.at 689. Even if Petitioner had overcome the strong presumption that appellate counsel's conduct fell within the wide range of reasonable professional assistance, he fails to show prejudice. *See id.* at 687. Petitioner's implicit argument that a different attorney could have had any more success pursuing the claims that Petitioner listed in his habeas petition is mere speculation. *See Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1981) (per curiam) (holding that mere speculation insufficient to demonstrate prejudice).

ORDER - 12

### C. Actual Innocence

In his fourth ground for relief, Petitioner argues that his conviction on "count 15," lewd or lascivious acts under California Penal Code section 288(a), was a miscarriage of justice because he is actually innocent. (Am. Pet. 18 (Dkt. No. 4 at 16).) A miscarriage of justice occurs if the petitioner can show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. *See House v. Bell*, 547 U.S. 518, 555–56 (2006) (Roberts, J., concurring in part and dissenting in part). A miscarriage of justice claim is not itself a constitutional claim but is instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits. *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997) (en banc) (*citing Herrera v. Collins*, 506 U.S. 390, 404 (1993)).[9] The reasoning for this rule is that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact. *Herrera*, 506 U.S. at 400; *see also Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials.").

Petitioner does not seek excusal of a procedural error so that he may bring an independent constitutional claim challenging his conviction or sentence. *See Herrera*, 506 U.S. at 404. Instead, Petitioner argues that a Multi-Disciplinary Interview Center ("MDIC") report supports the victim's testimony that she told an MDIC interviewer "that 'count fifteen' did not happen." (Am. Pet. 18 (Dkt. No. 4 at 16).) The miscarriage of justice exception is available "only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence." *Herrera*, 506 U.S. at 404 (*quoting Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986) (plurality opinion) (emphasis

---

[9] Serving only a six-year sentence, Petitioner does not assert a freestanding claim of actual innocence that occurs in capital cases when "the evidence sufficiently establishes his innocence to render his execution unconstitutional, irrespective of any constitutional error at his trial or sentencing." *Carriger*, 132 F.3d at 476–77; *see also House*, 547 U.S. at 555 (leaving the question open as to whether freestanding innocence claims in capital cases are possible); *Herrera*, 506 U.S. at 417–19 (assuming, without deciding, that execution of an innocent person would violate the Constitution).

ORDER - 13

added)). Without showing an exhausted claim for an independent constitutional violation occurring in the underlying state criminal proceeding,[10] Petitioner's miscarriage of justice claim fails to state a ground for federal habeas relief. *See Herrera*, 506 U.S. at 400.

**IV. CONCLUSION**

For the foregoing reasons, the Court hereby DENIES Petitioner's amended petition for writ of habeas corpus. (Dkt. No. 4.) The Clerk is instructed to close the case.

DATED this 23rd day of March, 2009.

/s/ John C. Coughenour
John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[10] In the traverse, Petitioner discusses a witness named "Leah" whom the police interviewed and the victim mentioned on the stand, and argues that he "has every reason to believe [she] would have spoken against [the state's] allegations." (Traverse 11–12 (Dkt. No. 19).) According to Petitioner, his appellate counsel provided ineffective assistance by not locating "Leah" after Petitioner told counsel her last name. (*Id.*) Petitioner did not make this argument in his amended petition. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (holding that a district court need not consider habeas claims raised for the first time in the traverse).
Even so, Petitioner does not convince the Court that, in light of this potential testimony, no juror acting reasonably would have found Petitioner guilty beyond a reasonable doubt. *See Schlup v. Delo*, 513 U.S. 298, 329 (1995) (describing the standard for miscarriage of justice). As the state court of appeals noted, Petitioner's conviction rested largely on a pretext telephone conversation during which he admitted to "engaging in oral copulation" with the victim. *McConico*, 2005 WL 3497711, at *3 (holding that Petitioner was not prejudiced when the trial court did allow rebuttal of the victim's testimony regarding her sexual history). His conviction was supported further by medical evidence, a teacher's testimony, and the testimony of another alleged victim who described similar experiences. *See id.* Considering it was harmless error that Petitioner could not question the victim during rebuttal about her prior sexual history, *see id.*, it was not a miscarriage of justice that "Leah" did not testify, as "[P]etitioner ha[d] every reason to believe [she] would," against the state's allegations. *Cf. Schlup*, 513 U.S. at 327 (stating that miscarriage of justice requires "a stronger showing than that needed to establish prejudice").

ORDER - 14